COMMISSIONER OF INTERNAL REVENUE v. UPJOHN'S ESTATE et al.

No. 8877.

Circuit Court of Appeals, Sixth Circuit.

Dec. 10, 1941.

William L. Cary, Sp.Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, and William L. Cary, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Thomas M. Wilkins, of Washington, D. C., for respondent.

Before SIMONS, ALLEN, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

William E. Upjohn, deceased, after making certain specific devises and bequests by will, left the entire residue of his estate in trust for certain charitable uses. The excess income of the trust which would become part of the residue, was asserted, by the trustee, to be deductible from the taxable income of the trust as an amount permanently set aside or to be used for the purposes described in § 162(a) of the Revenue Act of 1934, and its counterpart in the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 162(a). The Commissioner disallowed the deductions in the denial of a claim for refund of an overpayment of taxes for 1934, and as the basis for a deficiency assessment for 1936, and his petition seeks to review a decision of the Board of Tax Appeals adjudicating the overpayment and setting aside the deficiency assessment.

The review raises two questions: (1) Whether the income of a trust estate greatly in excess of amounts required for expenses and annuities to be paid from income and becoming part of a residue left to charity is deductible as an amount permanently set aside or to be used for the purposes described in the section; and (2) whether a bequest made "for such civic, charitable, educational or religious purposes and for such purposes of general and public welfare, as in their (the trustees') discretion may seem desirable, or as in their opinion would be approved by me if I were then present," constitutes a bequest exclusively for religious, charitable, scientific, literary or educational purposes as recited in the section here involved.

Upjohn, a resident of Michigan, died on October 18, 1932, leaving an estate of approximately 2½ million dollars. Included in it were more than 110,000 shares of fully paid and non-assessable common stock of the Upjohn Company engaged in the manufacture and sale of pharmaceutical products at Kalamazoo, Michigan, with sales branches in other states, in Canada, and elsewhere. The company had paid from 4 to 16 cash dividends on its common stock each year from 1910 to 1920, and monthly from that time on. Its dividends from 1932 to 1938, which included the worst

of the depression years, ranged from $2.10 to $2.95 per share. Its net worth, during that period, increased from 5¾ millions of dollars· to 10½ millions of dollars.

The will of the decedent devised and bequeathed the entire residue of his estate to trustees, with usual powers for management and control and for the sale, conversion, investment and reinvestment of its proceeds, and directed that from the trust income the trustees were to pay taxes, insurance, repairs and the expenses of managing the estate; that for 5 years after the decedent's death they were to keep up "Brook Lodge," his country estate, at an expense not to exceed $15,000 in any one year; that for 5 years they were to pay out monthly, from income, to certain persons, amounts aggregating $1,325 per month, and annually the sum of $1,000 to each of 11 persons or their surviving issue. Provision was made for annual payments out of income for 5 years, of $2,000 to the First Congregational Church of Kalamazoo, and $1,000 annually to the Congregational Board of Ministerial Relief of New York City. In addition, provision was made for certain non-periodic payments to churches and religious organizations, and his trustees were required to pay out of income during the first 5 years after death, such sum as might be necessary, not in excess of $25,-000, to liquidate the indebtedness of the First Congregational Church.

Subdivision V,· subsection (k), of the will, provided that if the net income of the estate during the first 5 years after death should be insufficient, after due provision for the maintenance of Brook Lodge, to pay previously listed bequests, "then said bequests shall be reduced and paid pro rata."

At the end of 5 years certain of the common stock of the Upjohn Company was to be transferred to various individuals or trusts; and then followed the ninth section of the will, here subject to controversy, which provided that at the end of 10 years following the decedent's death, the trustees were to offer for sale any residuary property remaining in their possession not otherwise held for disposition, with preference to be given, as purchasers, to children then living, and the proceeds of such sale were to be paid out as soon as practical and consistent with good judgment "for such civic, charitable, educational or religious purposes, and for such purposes of general and public welfare as in their discretion may seem desirable, or as in

their opinion would be approved by me if I were then present." There followed advice to executors and trustees that Upjohn stock should not be converted into or exchanged for other property, but should be retained in the form received. This advice was given not as binding any one, but expressly to emphasize the testator's strong faith in the continued success of the Upjohn Company.

Following the satisfaction by the trustee of all of the specific bequests made in the will, there remained in the trust estate 13,041.3 shares of the Upjohn Company stock, the fair market value of which, during 1934, was $442,100.07, or $33.90 per share. There was evidence credited by the Board that it was reasonably anticipated from 1932 to 1938 that the dividend rate of the company would continue for 10 years, and that the expenses of the estate would not show much variation. All of the payments required to be made monthly, annually, and non-periodically in lump sums out of income, were made and deducted in the respondent's tax returns, and the taxes thereon paid by the beneficiaries where required. The remaining income of the estate, no part of which was allowed as a deduction in computing net taxable income, was for 1934, $194,107.39; for 1935, $181,897.03; and for 1936, $209,738.16. Excess income for 1934 and 1936 only is here involved.

The petitioner, conceding that the intent of the testator, gathered from the four corners of the will, must control decision as to the required disposition of excess income of the trust, contends that a reasonable interpretation of the donor's intent, indicated by the structure of the will and its specific provisions, is that it was not within the contemplation of the decedent that all payments to annuitants should be made strictly upon an annual basis with the balance at the year's end added to the corpus of the estate. If such premise be sound, then it is argued that excess income was not permanently set aside for religious and cognate purposes because excess income of one year might be used to compensate for deficiencies in income during other years, and there can be no definite ascertainment therefore of the sums set aside for charitable uses, relying upon Boston Safe Deposit & T. Co. v. Commissioner, 1 Cir., 66 F.2d 179, certiorari denied, 290 U.S. 700, 54 S.Ct. 227, 78 L.Ed. 602; Guarantee Trust Company of New York v. Commissioner, 2 Cir., 76 F.2d 1010, cer-

tiorari denied, 296 U.S. 591, 56 S.Ct. 103, 80 L.Ed. 418; Moorman Home for Women v. United States, D.C., W.D.Ky., 42 F.2d 257. To support the premise that accumulated income in any one year was subject to the payment of annuities and expenses of other years, the petitioner points to the clauses of the will which provide for non-periodic outlay during the 5-year period after death, including· the provision for the upkeep of Brook Lodge, payment of the indebtedness of the First Congregational Church and the transfer of Upjohn stock at the end of 5 years to annuitants. His first consideration, it is said, was to provide for his beneficiaries under all circumstances, and for his relatives first by annuities and thereafter by bequests of stock which would give them income after five years, substantially equal to the annual payments provided by the will. Finally, he points to the provision of the will directing that if the net income of the estate during the first 5-year period shall be insufficient to pay enumerated bequests in full, "then said bequests shall be reduced and paid pro rata" as indicating that the testator contemplated the possibility that income in any one or more years would be insufficient to provide as fully as he desired for the recipients of his bounty.

Undoubtedly, if there is a probability under the terms of the grant, or reasonably a possibility that money or property bequeathed to a charitable trust may be invaded as to corpus or income so that the amount ultimately available for charitable purposes is not ascertained, or capable of ascertainment, then it cannot be said that there is any amount "permanently set aside" for the charitable uses which the statute permits to be deducted, for the rule is well established that deduction for a charitable gift will be allowed only if its value can be ascertained definitely at the date of the testator's death. Humes v. United States, 276 U.S. 487, 48 S.Ct. 347, 72 L.Ed. 667; United States v. Provident Trust Co., 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793; Boston Safe Deposit & T. Co. v. Commissioner, supra; Gammons v. Hassett, 1 Cir., 121 F. 2d 229.

Assuming, however, that the statement so often made in the cases that taxation is essentially a practical matter, is not a mere euphemism, useful when taxes are to be imposed but to be ignored when they are sought to be avoided, we must, in the fact situation disclosed by the record, conclude· that Upjohn had in mind the unusual and phenomenal dividend record of the Upjohn stock; that his faith in the enterprise, demonstrated by his injunction to the trustees for its retention, precludes an interpretation that in the execution of the will he considered that the dividends upon the stock would prove insufficient in any one year to meet the current charges upon the income of the trust. While the trustees were not required to pay the non-periodic bequests monthly or annually, they were not confined to a lump sum payment but were given latitude to liquidate the obligations of the trust by periodic payments if, in their judgment, advisable. The provisions in the will for payments to annuitants, monthly or annually, are in negation of an intention that deficiencies, if they should arise, were to be restored from the accumulated income of prior years. But regardless of criteria as a basis for interpretation through inference, the intention of the testator is, in this respect, specific, and to the expressed direction of his will all inferences must yield. He directed, in § V (k), that if the net income of his estate should be insufficient for purposes indicated, "then said bequests shall be reduced and paid pro rata." It is true, of course, that from this provision there may be drawn the thought that he considered the possibility, however remote, that a contingency might arise that would result in deficiency in a given year.· But overriding the persuasiveness of all deductions, is the specific direction that the bequests be reduced and paid pro rata. Clearly, therefore, the petitioner's premise that the will permits an invasion of excess income of one year to liquidate obligations of another year, or an invasion of a·corpus with which excess income had been merged, must be rejected.

We find ourselves in agreement with the court of the Tenth Circuit, in Commissioner v. F. G. Bonfils Trust, 115 F.2d 788, and with the Board of Tax Appeals, that the bare possibility, considered abstractly and merely in terms of power, of an invasion of a fund devoted to charitable purposes, that is so remote that it may not, as a practical matter, be said to·exist at all, does not render incapable of definite ascertainment the fund devoted to the beneficent purposes recited in the act. It is idle to speculate upon remote possibilities of diversion of the trust fund to non-charitable uses. If such speculations were dependable criteria for determining deductions, con-

gressional encouragement to private benefaction would prove futile and no charitable trust could escape the charge that it is without the deductible section of the statute. It is true, of course, as noted in the dissenting opinion in the Bonfils case, that deductions from gross income depend upon legislative grace; that the usual presumptions in favor of the taxpayer do not apply when exemption from taxation is claimed; and that when the taxpayer seeks deduction, authority therefor must be found in the statute and he must bring himself within its terms. This does not mean, however, that the problem may not be viewed realistically as in the Bonfils case, or that the plain intent of Congress to encourage charitable contributions by relieving them from taxation should be ignored. Lederer v. Stockton, 260 U.S. 3, 43 S.Ct. 5, 67 L. Ed. 99; United States v. Provident Trust Company, supra. So viewed, we conclude that the testator intended annual expenses and annuities to be paid out of current annual income, that he envisioned no circumstances reasonably expectable that they could not so be paid since reasonably predictable income was from 3 to 4 times the obligations of the trust, and that there was no intention that excess income for one year should be used to pay charges upon the fund in any other year. The Commissioner's premise in this respect being rejected, his conclusion that the charitable bequest was not definitely ascertainable, fails.

▮▮ Upon the second question, the petitioner's argument is that the trustees, while authorized to make payments at the end of 10 years for the charitable, educational, scientific or religious purposes embraced in the statute, were not restricted to such purposes but were also authorized to make them for civic and general public welfare purposes, and so it was possible that none of the payments made by the trustees would constitute proper deductions. We do not understand that to come within the statute its exact words must define the limits of a charitable trust, failing which there may not be conferred upon it the exemption granted by the Congress.

It is axiomatic, as a principle of construction, that words in a statute, or a written instrument, are not to be measured separately but each term is to be construed in its association with other terms and in its general environment. Little need be added to what we said concerning the connotation of the phrase "public welfare" in a similar environment in Chicago Bank of Commerce v. McPherson, 6 Cir., 62 F.2d 393, at 397. At the time of the devise there considered, we sensed that the term "public welfare" had come in the public mind to be synonymous with public charity, and to signify some form of direct relief to the public. Matured consideration casts no doubt upon our conclusion and reveals other adjudications of like import. Compare Ould v. Washington Hospital, 95 U.S. 303, 24 L.Ed. 450; St. Louis Union Trust Co. v. Burnet, 8 Cir., 59 F.2d 922, 924, 926; Bok v. McCaughn, 3 Cir., 42 F.2d 616, 618.

But in addition to the meaning which had already come to be associated with the term "public welfare" at the time of the death of the testator, we have here added criteria to his intention in the ninth section of the will. The beneficiaries of the grantor's bounty were to be causes and institutions of the kind that would have been "approved by me if I were then present." The record discloses that during the last 10 years of his life, the testator had contributed to charitable, educational and scientific organizations over $550,000, and a list of the recipients of his contributions is contained in the record. They are a guide to the intent of the donor and the obligations of his trustees, morally certainly if not, indeed legally. Without exception his lifetime benefactions were of the character and for the purposes that are by the statute permitted to be deducted if permanently set aside. This guide is not to be ignored. We conclude that the sums for which the respondent claimed deductions were permanently set aside and for the purposes permitted by the act as a basis for deduction.

The decision of the Board of Tax Appeals is affirmed.