COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

The LEON A. BEEGHLY FUND, The Un-
ion National Bank of Youngstown,
Ohio, Trustee, Respondent.

No. 14691.

United States Court of Appeals
Sixth Circuit.

Dec. 5, 1962.

Frederick E. Youngman, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

William H. Fleming and Howard F. Burns, Cleveland, Ohio (Alan G. Rorick, Cleveland, Ohio, on the brief; Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel), for respondent.

Before MILLER, Chief Judge, CECIL, Circuit Judge, and THORNTON, District Judge.

SHACKELFORD MILLER, Jr., Chief Judge.

This proceeding involves the federal income tax liability for the year 1949 of The Leon A. Beeghly Fund, a trust, hereinafter referred to as "taxpayer," "Beeghly Fund," or "Fund," with respect to which the Commissioner determined

a deficiency in such tax in the sum of $10,280,673.27. The case involves tax exemption of the Beeghly Fund under Section 101(6) of the Internal Revenue Code of 1939, claimed by the taxpayer, and also deductions from gross income claimed by the taxpayer under Section 162(a), Internal Revenue Code. On review by the Tax Court it was held that there was no deficiency in income tax for the taxable year 1949 and that there was an overpayment in income tax in the amount of $8,711,688.10, which amount was paid after the mailing of the notice of deficiency. The Leon A. Beeghly Fund, et al. v. Commissioner, 35 T.C. 490. The petitioner seeks a review by this Court of the decision of the Tax Court.

The facts, which are not in dispute, are stated at length in the opinion of the Tax Court and have also been stated in less detail by this Court in Cold Metal Process Co. v. Commissioner of Int. Rev., 247 F.2d 864, C.A.6th, and need not be repeated here except insofar as it appears advisable to restate the basic facts which point up the nature of the issue now before us.

The Cold Metal Process Co., hereinafter referred to as "Cold Metal," an Ohio corporation, was incorporated in 1926 with 2,000 shares of outstanding common stock. It kept its books on an accrual basis of accounting. Its principal assets consisted of two United States patents relating to the hot and cold rolling of metals. The process covered by the patents gained wide usage in the metals industry, and beginning in 1928 Cold Metal granted nonexclusive licenses to certain manufacturers. Various other manufacturers, not licensed, installed rolling mills which Cold Metal claimed embodied its inventions and infringed its patents. Cold Metal brought suits for infringement against several large producing companies.

In 1943 the United States started a suit, hereinafter referred to as the Cancellation suit, in the United States District Court for the Northern District of Ohio against Cold Metal seeking cancellation of the patents on the ground of fraud or a mutual mistake of fact in the issuance of the patents. On the motion of the United States, the District Court entered an interlocutory order on October 10, 1944, hereinafter referred to as the Impounding order, which directed that future royalty payments and damages for infringement be deposited with the Clerk of the Court until the termination of the litigation. Final judgment in the District Court dismissing the complaint was entered for Cold Metal on September 20, 1945. It was affirmed in 1947 by this Court in United States v. Cold Metal Process Co., 164 F.2d 754, cert. denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742, rehearing denied 334 U.S. 835, 68 S.Ct. 1343, 92 L.Ed. 1761. Before this case was finally terminated there was paid into court and impounded under the provisions of the Impounding order the sum of $9,749,000.00, which was eventually released and paid in 1949 to the Trustee of the Beeghly Fund, who in the meantime, as hereinafter set out, became the sole stockholder of Cold Metal and acquired all of its assets in dissolution. This money and other payments received by the Trustee in 1949 as a result of settlements and royalty payments constituted the basis for the deficiency assessment against the Trustee for the year 1949, herein in controversy.

In 1940 Leon A. Beeghly, who was one of Cold Metal stockholders and Chairman of its Board of Directors, transferred 150 shares of Cold Metal stock to The Union National Bank of Youngstown, Ohio, in trust for certain charitable purposes. In 1944 he transferred one additional share to the Trust. The Cancellation suit and the impounding order resulted in the discontinuance of payment of dividends to Cold Metal stockholders. Cold Metal also became pressed for money to continue prosecution of its infringement suits. Internal friction developed among the stockholders and directors. Negotiations were entered into, looking to the settlement of the infringement suits, but settlement direct with the alleged infringing steel companies was not accomplished, partly because of the

pending Cancellation suit. A plan was worked out by which the stockholders of Cold Metal would sell all of their shares to the Trustee, Cold Metal would be liquidated, with the Trustee as sole stockholder acquiring all of its assets, and the infringement claims would then be settled by the Trustee with the steel companies. This would enable the Cold Metal stockholders to dispose of their stock on a capital gains basis for income tax purposes.

On December 28, 1945, the Trustee entered into a separate agreement with each of the other stockholders whereby it purchased all of their shares in Cold Metal for the sum of $11,131,000.00 at prices varying from $4,250.00 to $7,500.00 per share. $200.00 per share was to be paid in cash upon delivery of the certificates. The balance was to be paid at a later time in accordance with the plan looking to the dissolution of Cold Metal and the payment to the Trustee, who would acquire its assets, of the impounded funds in the Registry of the Court, the collection of existing unliquidated claims for damages, and the payment to the Trustee by sundry licensees of royalties under patents formerly owned by Cold Metal. In addition to the purchase of the stock, the Trustee assumed current liabilities of Cold Metal in the amount of $879,287.98, making a total obligation of $12,010,287.98. As of December 31, 1945, the Trustee had claims for amounts then due totaling $16,079,276.06, none of which, however, was then available for the payment of the obligations assumed by the Trustee. Accordingly, it was understood and agreed that the Trustee, after transfer to it of Cold Metal's assets, would acquire the necessary cash, to make the initial payment to Cold Metal's shareholders by sale of the stock of Cold Metal's subsidiary, Cold Metal Products Company.

On December 29, 1945, certificates for the 1849 shares were delivered duly endorsed to the Trustee, and delivered by the Trustee to Cold Metal in exchange for certificates making the Trustee record owner of all the 2,000 shares of outstanding stock. In accordance with a pre-arranged plan between certain former stockholders of Cold Metal, The Union National Bank of Youngstown, Ohio, and the Trustee, the Trustee acquired $375,000.00 in cash, which it used to make the initial cash payments totaling $369,800.00 to the transferring stockholders of Cold Metal. Necessary proceedings were also taken to dissolve Cold Metal and a certificate of dissolution of Cold Metal was filed with the Secretary of State of Ohio on December 29, 1945. At that time the officers of Cold Metal executed an instrument entitled "Assignment and Distribution in Kind" transferring to the Trustee all of the assets of Cold Metal, subject, however, to the Impounding order in the Cancellation suit.

Thereafter, settlements were made with various infringing steel companies with the proceeds therefrom being impounded in Court. Extensive litigation followed, which eventually was terminated successfully to the Trustee, resulting in the payment to the Trustee in 1949 from various sources, including the impounded funds in the Cancellation suit, of the sum of $15,438,220.71. This gross income is the basis for the 1949 deficiency assessment against the Trustee, herein involved. Against this gross income the Commissioner, in determining the deficiency, allowed deductions of approximately $2,100,000.00, consisting of interest paid during the taxable year, payments for professional services and miscellaneous expenses, and $66,300.00 actually paid to charitable organizations during the taxable year.

In the Tax Court proceeding it was shown that of the $15,438,220.71 received by the Trustee during 1949, over half of it, or approximately $7,791,000.00 represented a return of basis in the assets on liquidation of Cold Metal, leaving a net income of approximately $5,535,000.00. Approximately $7,282,000.00 in taxes and $1,247,600.00 in interest thereon was paid by the Trustee to the Collector of Internal Revenue in 1949, as taxes assessed, for the most part by jeopardy assessment, against the Trustee as trans-

feree of Cold Metal for Cold Metal's taxes for 1943 and 1945. During 1949 the Trustee paid out on the purchasing price of the stock of Cold Metal the sum of $2,429,000.00, paid outstanding notes in the amount of $586,000.00, and invested $2,800,000.00 in United States securities. In making its ruling that there was no deficiency in income tax for the taxable year 1949, the Tax Court held that, in addition to the deduction in the amount of $66,300.00 actually paid by the Trustee to charitable organizations, the Fund was entitled to a further deduction under Section 162(a) in an amount equal at least to the net income of the trust for the year 1949, in that payments in 1949 in excess of that amount, as hereinabove set out, qualified under the terms of the trust agreement as amounts permanently set aside in 1949 for charitable purposes or to be used exclusively for charitable purposes within the meaning of Section 162(a), Internal Revenue Code.

This is the third time that income tax liability asserted by the Commissioner under the foregoing facts has been before this Court. Initially, the Commissioner determined deficiencies against Cold Metal and the Beeghly Fund as transferee for the taxable year 1945 with respect to $10,600,000.00 impounded in court actions and later received by the Fund in 1949. The Tax Court held that the $10,600,000.00 there in issue did not accrue as income to Cold Metal in 1945, which decision was affirmed by this Court without opinion on November 21, 1952. Cold Metal Process Co. v. Commissioner, 17 T.C. 916. The Commissioner later determined deficiencies for the year 1949 against Cold Metal and the Beeghly Fund as transferee on the same income which is sought to be taxed in this case. The Tax Court sustained the Commissioner's determination to the extent of holding that Cold Metal was taxable upon income which, although earlier held not accruable to Cold Metal in 1945, represented royalties and amounts paid in 1949 for infringement of its patents on production

prior to December 29, 1945, the date of assignment of its assets to the Fund. Cold Metal Process Co. v. Commissioner, 25 T.C. 1333. The Tax Court decision was reversed by this Court, which held that no part of the income there in issue was taxable to Cold Metal. Cold Metal Process Co. v. Commissioner, supra, 247 F.2d 864. In that case we expressly reserved the question of the Trustee's direct income tax liability on the income received by it in 1949. 247 F.2d at p. 871. That question is the one now before us in this proceeding.

The taxpayer contended in the Tax Court and contends here that (1) the Beeghly Fund was exempt from income tax for the year 1949 under Section 101 (6), Internal Revenue Code of 1939, and (2) if the Beeghly Fund was not exempt in the year 1949 under Section 101(6), it was entitled to a deduction under Section 162(a), Internal Revenue Code, in an amount at least equal to its net income as otherwise determined, and, accordingly, had no taxable income during the year 1949. The Tax Court rejected taxpayer's first contention, but sustained the second contention. Accordingly, it ordered that there was no deficiency in income tax for the taxable year 1949, and that there was an overpayment in income tax for the taxable year 1949 in the amount of $8,711,688.10, which amount was paid after the mailing of the notice of deficiency.

If the Tax Court was correct in its ruling on taxpayer's second contention, its decision must be affirmed, irrespective of the correctness of its ruling on taxpayer's first contention. We go immediately to the second contention.

Under the instrument of December 28, 1940, creating the Beeghly Fund, the donor assigned and transferred securities described in a schedule attached to the Trustee under an irrevocable trust created thereby for the use and benefit of corporations or associations, funds or foundations, organized and operated exclusively for religious, charitable, literary or educational purposes, no part of the

net earnings of which inured to the benefit of any private shareholder or individual and no substantial part of the activities of which was carrying on propaganda or otherwise attempting to influence legislation.

For the purpose of directing the disbursement by the Trustee of the net income from and principal of the trust estate, the trust instrument provided for an appointing committee to designate such disbursements of income or principal, which committee would from time to time, in writing, direct the payment of the net income from the trust estate and the disbursement of the principal thereof among such beneficiaries as provided by the trust instrument.

On August 12, 1941, the Commissioner issued a ruling that the Fund was exempt from Federal income tax under the provisions of Section 101(6), Internal Revenue Code. On or about June 23, 1948, the Commissioner ruled that beginning December 28, 1945, the Fund was no longer exempt under Section 101(6). The Commissioner made no change in his earlier ruling that the Beeghly Fund was organized exclusively for the charitable purposes stated in Section 101(6), nor was there any suggestion that the trust had not been operated exclusively for charitable purposes during the period December 28, 1940, through December 27, 1945. The Commissioner does not depart from that position in the present proceeding. Income tax liability is claimed by reason of the purchase by the Trustee on December 28, 1945, of all the stock of Cold Metal, the dissolution of Cold Metal, and the obligations and actions of the Trustee flowing from the contract of purchase of December 28, 1945.

Section 162(a), prior to its amendment in 1950, provides that the net income of a trust shall be computed in the same manner and on the same basis as in the case of an individual, except that there shall be allowed as a deduction, "any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in Section 23(o), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, * * *."

■ We believe that if the deduction qualifies in other respects, there is no question about the deduction being a valid one, even though no payment is actually made to the charitable beneficiary during the taxable year. The statute does not require that it be actually paid—it requires that it be "paid or permanently set aside." Arthur Jordan Foundation v. Commissioner of Int. Rev., 210 F.2d 885, C.A.7th. See: Ohio Furnace Co. v. Commissioner, 25 T.C. 179, 190.

■ The Commissioner contends that no part of the gross income of the Trustee in 1949 was in fact or could have been permanently set aside for charitable organizations during that year because the trust agreement did not operate ipso facto to permanently set aside any amount for charity, but instead affirmative action in that connection by an appointing committee was required. No such affirmative action was taken in the present case. The statute, however, does not make the deduction dependent upon the action of the fiduciary in crediting upon its books to a certain beneficiary the income received by it. The allowance of the deduction is controlled by the statute, not by a provision in the trust instrument which goes beyond the requirements of the statute. We are of the opinion that the Tax Court was correct in rejecting this contention. Bowers v. Slocum, 20 F.2d 350, C.A.2nd; Commissioner of Int. Rev. v. Citizens & So. Nat. Bank, 147 F.2d 977, 980, C.A.5th; Arthur Jordan Foundation v. Commissioner of Int. Rev., supra, 210 F.2d 885, 888, C.A.7th; Old Colony Trust Co. v. Comm'r, 301 U.S. 379, 382–384, 57 S.Ct. 813, 81 L.Ed. 1169. Accordingly, our

question remains, was the 1949 income, under the facts of this case, permanently set aside for charitable purposes within the meaning of Section 162(a).

The Commissioner contends that income could not be permanently set aside for charitable purposes unless income was available for that purpose, and the fact that the trust had net income in the taxable year, does not mean that it had income available to be set aside for charity. He points out that the gross income received by the trust in 1949 was subject to legal obligations—(1) the payment of income tax, and (2) the payment of the obligations assumed by the Trustee under the 1945 agreement—which obligations were greater than the amount received by the trust in 1949, thereby leaving no funds available to be set aside for charitable organizations. Or stated another way, the gross income received by the trust in 1949 was all committed to purposes other than charitable purposes. He relies upon the rule that if there is a probability under the terms of the grant that property bequeathed to a charitable trust may be invaded as to corpus or income so that the amount ultimately available for charitable purposes is not ascertained or capable of ascertainment, then it cannot be said that any amount is permanently set aside for the charitable uses which the statute permits to be deducted. Commissioner of Internal Rev. v. Upjohn's Estate, 124 F. 2d 73, 76, C.A.6th, and cases cited therein; Langenbach's Estate v. Commissioner of Internal Rev., 134 F.2d 590, C.A. 6th.

We think that a distinction must be made between cases where the provisions of the instrument itself render uncertain whether the charitable donees will actually take, and cases where there is no uncertainty under the provisions of the instrument that net income *must* be used for charitable purposes, but valid claims and charges against the trust render uncertain for the time being the exact amount of the net income which is committed to charitable purposes. Rockland Oil Co. v. Commissioner, 22 T. C. 1307, 1312; Commissioner of Internal Rev. v. Upjohn's Estate, supra, 124 F.2d 73, 77, C.A.6th; Arthur Jordan Foundation v. Commissioner of Int. Rev., supra, 210 F.2d 885, 888–889, C.A.7th.

In the present case there is no legal uncertainty about the entire net income being committed to charitable purposes. This amount is, of course, uncertain until the end of the taxable year, being controlled by the amount of gross income received and the deductions therefrom of legal operating expenses, including such items as rent, salaries, supplies, postage and taxes, which amounts will vary from year to year. But such uncertainty does not deprive such a taxpayer of the deduction granted by Section 162(a) after the amount thereof has been definitely determined. Essentially, it would seem that the nature and legality of the disbursements by the Trustee is the controlling factor, rather than the fact that the exact amount of the resulting net income is temporarily uncertain.

Accordingly, the question narrows itself down to whether the use by the Trustee in 1949 of its income to meet its tax obligations and its obligations to the former stockholders of Cold Metal and other obligations incurred under the purchase agreement of December 28, 1945, with the result that there was only $66,300.00 income available in 1949 for charitable organizations, prevents its remaining net income from being "permanently set aside" for charitable purposes within the meaning of Section 162(a). This question is fully treated in the opinion of the Tax Court, in which it is pointed out that both the corpus and income of the trust were irrevocably dedicated for the use and benefit of charitable organizations and the use of any such income to pay for the assets which produced it or to pay for other assets which will produce more income would, under the terms of the trust agreement, be used exclusively for charitable purposes at

**762**

some time. We agree with the ruling and reasoning of the Tax Court on this issue in the case. Arthur Jordan Foundation v. Commissioner of Int. Rev., supra, 210 F.2d 885, C.A.7th; Rockland Oil Co. v. Commissioner, supra, 22 T.C. 1307. See also: Knapp Brothers Shoe Mfg. Corp. v. United States, 135 Ct.Cl. 797, 142 F. Supp. 899, 902; Ohio Furnace Co. v. Commissioner, supra, 25 T.C. 179, 189; Estate of Ernest G. Howes v. Commissioner, 30 T.C. 909, 925, affirmed 267 F.2d 382, 386, C.A.1st; The Shiffman Foundation v. Commissioner, 32 T.C. 1073, 1080. As pointed out in those cases, the payments to the sellers of the Cold Metal stock was the payment of the consideration in a purchase of stock for value received, and that there was no diversion of income to a noncharitable purpose in the Trustee paying its legal debts before distributing the balance to the charitable organizations designated in the trust instrument. The Commissioner does not question the authority of the Trustee to enter into the 1945 transaction nor the validity thereof. The obligations of the Trustee incurred thereby were accordingly valid, enforceable ones. It is conceded that the transaction enabled the Cold Metal stockholders to dispose of their stock on a capital gains basis for income tax purposes, but as heretofore stated by this Court in the Commissioner's attempt to subject this same income to an income tax against Cold Metal itself, such a motive to avoid income taxation is not material. Cold Metal Process Co. v. Commissioner of Int. Rev., supra, 247 F. 2d 864, 871, C.A.6th; United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251; United States v. Cummins Distilleries Corporation, 166 F.2d 17, C.A.6th.

Our ruling on this issue in the case makes it unnecessary to consider whether the Tax Court was in error in holding that the taxpayer was not an exempt organization under Section 101(6), Internal Revenue Code.

The decision of the Tax Court is affirmed.