## ESTATE OF EILEEN S. BELMONT, DECEASED, DIANE SATER, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9409–11.            Filed February 19, 2015.

Decedent's (D) will directed that the residue of her estate, which included income in respect of a decedent, be left to charity. The estate (E) took a charitable contribution deduction pursuant to I.R.C. sec. 642(c)(2) on its Federal income tax return, claiming that it had permanently set aside an amount of its gross income for charity. At the time of her death, D owned a condominium in which her brother (B) resided. During the protracted administration of the estate, B took a variety of legal actions and asserted a life tenancy interest in the condominium. B was subsequently awarded a life tenancy in the condominium. Because of the cost of litigation over the condominium, E no longer had sufficient funds to pay the amount previously deducted as a charitable contribution. *Held*: I.R.C. sec. 642(c)(2) provides that any part of the gross income of an estate, which pursuant to the terms of the will is permanently set aside during the taxable year for a purpose specified in I.R.C. sec. 170(c), shall be allowed as a deduction to the estate. Sec. 1.642(c)–2(d), Income Tax Regs., provides that no amount will be considered permanently set aside for charity under I.R.C. sec. 642(c)(2) "unless under the terms of the governing instrument and the circumstances of the particular case the possibility that the amount set aside * * * will not be devoted to such purpose or use is so remote as to be negligible." The possibility that costs involved in a dispute over the condominium would cause E to invade the amount set aside for charity was not "so remote as to be negligible" as required under sec. 1.642(c)–2(d), Income Tax Regs. Therefore, E did not "permanently set aside" the charitable contribution amount as required under I.R.C. sec. 642(c)(2).

*Katherine R. Dodson* and *Brian J. Harstine*, for petitioner. *Richard J. Hassebrock*, for respondent.

RUWE, *Judge*: Respondent issued a notice of deficiency to the Estate of Eileen Belmont (estate) determining a $75,662 deficiency in the estate's Federal income tax for the taxable period ending March 31, 2008.[1] The issue for decision is whether the estate is entitled to a $219,580 charitable con-

---

[1] All section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All monetary values have been rounded to the nearest dollar.

tribution deduction for purposes of computing its income tax for the taxable period ending March 31, 2008.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Eileen S. Belmont (decedent) resided in Ohio at the time of her death. Diane M. Sater, the executrix of decedent's estate, was a resident of Ohio at the time the petition was filed.

Decedent died testate on April 1, 2007. At the time of her death decedent's only heirs were a brother, David Belmont (David), who lived in California and a half-sister in Ohio. On April 5, 2007, a proceeding to administer decedent's estate was opened in the Franklin County, Ohio Probate Court (Ohio Probate Court). James G. Flaherty is an attorney who prepared decedent's last will and testament (will) and represented the estate in the Ohio Probate Court. [2]

Decedent signed her will on February 11, 1994. The will instructs that decedent's real, personal, and intangible property—with the exception of two "Swedish tiles" bequeathed to a friend—be left to her mother (Wilma) if she were still alive at the time of decedent's death. Because Wilma predeceased decedent, [3] the will provides that decedent's real and personal property become part of the estate's residue and be distributed as follows: (1) $50,000 to David and (2) "the rest, residue, and remainder" to the Columbus Jewish Foundation (foundation). The foundation is a recognized section 501(c)(3) charitable organization.

At the time of her death decedent was the titled owner of two pieces of real property: (1) her primary residence in Westerville, Ohio (Ohio residence), and (2) a condominium in Santa Monica, California (Santa Monica condo), which she purchased on January 2, 2003. The estate sold the Ohio residence on February 29, 2008, for $217,900. [4] Decedent also

---

[2] On September 6, 2013, Mr. Flaherty filed a motion to withdraw as counsel for the estate because he was to be a witness in the trial before this Court. The Court granted his motion on September 11, 2013.

[3] Wilma passed away on October 13, 2001.

[4] Proceeds from the sale of the Ohio residence were received by the es-
Continued

maintained a retirement account with the State Teachers Retirement Pension Fund of Ohio (STRPF). Following decedent's death the STRPF distributed $243,463 to the estate. The $243,463 distribution was income in respect of a decedent pursuant to section 691 and was reported on the estate's income tax return for its taxable period ending March 31, 2008. Of the $243,463 distribution, $24,346 was withheld for Federal tax and the remaining $219,117 was deposited into the estate's checking account.

On April 8, 2008, the estate filed a first partial fiduciary's account with the Ohio Probate Court detailing the receipts and disbursements of the estate from April 1, 2007, to March 31, 2008. The account reported total receipts of $426,557 and total disbursements of $141,548 by the estate. As of March 31, 2008, the estate had $285,009 remaining in its checking account.

On July 17, 2008, the estate filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, for its taxable period ending March 31, 2008. At the time the estate filed its Form 1041 there were no income-producing assets remaining in the estate. Certified Public Accountant (C.P.A.) Connie Becker prepared the Form 1041. The estate did not inform Ms. Becker of any claims against the Santa Monica condo. In the Form 1041 the estate reported income of $241,184, consisting of: the $243,463 STRPF distribution, $721 of interest income, and a $3,000 long-term capital loss. After claiming deductions for taxes, return preparation fees, and other miscellaneous fees and expenses totaling $21,604, the estate claimed a $219,580[5] charitable contribution deduction. The estate claimed the $219,580 charitable contribution deduction on the basis of decedent's will leaving the residue of her estate to the foundation. As of July 17, 2008 (the date the estate filed the Form 1041), the $219,580 charitable contribution had not been paid to the foundation. The estate did not segregate the $219,580 from the other funds

_____

tate before the closing of the taxable period ending March 31, 2008.

[5] There is a slight discrepancy between the $219,117 STRPF distribution and the $219,580 charitable contribution deduction the estate claimed on its Form 1041. Neither party disagrees that the deduction at issue is $219,580.

in its checking account which were used to pay claims and administrative expenses.

On June 1, 2009, the estate filed a second partial fiduciary's account with the Ohio Probate Court detailing the receipts and disbursements of the estate from April 1, 2008, to March 31, 2009. The balance remaining in the estate's checking account as of March 31, 2009, was $272,675.

In July 1986 Wilma purchased and took title to a house in Santa Monica, California (5th Street residence). David resided in the 5th Street residence until August 2000, when the house was sold and he moved back to Ohio to assist decedent in caring for Wilma. As previously mentioned, Wilma died on October 13, 2001.

After Wilma's death decedent purchased the Santa Monica condo on January 2, 2003, for $285,000. To facilitate the purchase of the Santa Monica condo, decedent made a downpayment of approximately $100,000 and took out a $185,250 mortgage. In 2004 decedent paid in full the mortgage encumbering the Santa Monica condo. Although the record before the Court does not provide the exact date, sometime in mid-2006 decedent permitted David to move into the Santa Monica condo. David resided at the Santa Monica condo for approximately nine months until decedent's unexpected death on April 1, 2007. David apparently continued to reside in the Santa Monica condo rent free until he was awarded a life estate in January 2012.

In order to complete the administration of decedent's estate, the estate was required to open an ancillary estate in California to administer the Santa Monica condo. In late 2007 the estate retained the services of a prominent California probate administration law firm, Hoffman, Sabban & Watenmaker, to handle the ancillary estate administration in California. The decision by the estate to hire Hoffman, Sabban & Watenmaker was made after the law firm was referred to the foundation by the Los Angeles Jewish Foundation. Hoffman, Sabban & Watenmaker charged the estate a preset statutory fee of "around $13,000" to handle the ancillary estate administration and advised the estate that it could be billed between $350 and $450 per hour for any "extras" related to potential litigation or an appeal. On February 14, 2008, the estate opened an ancillary estate with

the Los Angeles County Probate Court to administer the Santa Monica condo.

Following decedent's death David discussed with Mr. Flaherty the possibility of exchanging his $50,000 bequest with the foundation for a life tenancy interest in the Santa Monica condo. On February 14, 2008—the same date the ancillary estate was opened in California—Ms. Sater mailed to David a letter (1) advising him that he could not purchase a life tenancy in the Santa Monica condo because the foundation did "not desire to hold real estate as an investment" and (2) requesting that he vacate the Santa Monica condo by March 21, 2008, in exchange for a "$10,000 stipend" from the foundation. David did not vacate the Santa Monica condo in exchange for the $10,000 stipend.

On April 2, 2008, David filed a creditor's claim with the Los Angeles County Probate Court claiming an alleged breach of contract on the basis that an oral agreement (agreement) existed between him, decedent, and their mother, giving him a life tenancy interest in the Santa Monica condo despite the agreement not being reflected in decedent's will. Peter Gelblum, a prominent California attorney, represented David pro bono. David was a client of a local mental health organization in California where Mr. Gelblum is a member of the board of directors.[6] On April 24, 2008, David filed a Lis Pendens, Notice of Pendency of Action (lis pendens) with the California Recorder's Office and the Los Angeles County Probate Court to alert third parties of potential action against the Santa Monica condo.

The estate rejected David's creditor's claim on May 13, 2008. On May 30, 2008, David filed an 850 Petition to Confirm Interest in Real Property (850 petition) with the Los Angeles County Probate Court, asserting a life tenancy interest in the Santa Monica condo on the basis of a "resulting trust" theory. In his 850 petition David claimed, inter alia, that his resulting trust from the sale of the 5th Street residence in 2000, along with his services to Wilma before her death in 2001, provided at least part of the purchase price for decedent's acquisition of the Santa Monica condo in 2003. On July 25, 2008, the estate filed its objections to David's 850 petition. In its objections the estate

---

[6] David apparently had long suffered from unspecified mental problems.

argued that David: (1) did not contribute to the purchase of the 5th Street residence in 1986; (2) had no interest in the 5th Street residence when it was sold in 2000; (3) had no interest in Wilma's estate; and (4) had no ownership interest in the funds decedent used to purchase the Santa Monica condo or in the Santa Monica condo itself.

On October 10, 2011, a trial was held in the Los Angeles County Probate Court to determine whether David had an interest in the Santa Monica condo. A judgment was entered in favor of David on January 26, 2012, and the estate appealed the decision on March 12, 2012. In an unpublished opinion filed February 28, 2013, the California appellate court upheld the decision of the Los Angeles County Probate Court and affirmed David's life tenancy interest in the Santa Monica condo.[7]

The estate incurred various expenses as a result of the probate litigation and subsequent appeal concerning the Santa Monica condo. In order to pay these expenses as well as the continuing administrative costs of the estate, the estate depleted some of the $219,580 that it had ostensibly set aside for the foundation.

At the time of trial before this Court on September 11, 2013, the estate had approximately $185,000 remaining in its checking account.

## OPINION

The issue is whether the estate is entitled to a $219,580 charitable contribution deduction for purposes of computing its income tax for the taxable period ending March 31, 2008. The estate contends that during the taxable year ending March 31, 2008, it permanently set aside $219,580 of its gross income for the benefit of the foundation and thus is entitled to a charitable contribution deduction for that amount pursuant to section 642(c)(2) and section 1.642(c)–2(d), Income Tax Regs. Respondent argues that the $219,580

_____

[7] The original judgment of the Los Angeles County Probate Court ordered the estate to provide David a life tenancy in the Santa Monica condo and to transfer the remainder interest to the foundation upon his death. This would have required decedent's estate to remain open until David's death. To resolve this issue, the California appellate court modified the original judgment, ordering the estate to execute a life estate deed to David and a remainder deed to the foundation.

was not permanently set aside for charitable purposes as required by the Code and regulations and therefore is not properly deductible by the estate.

As a general rule, the Commissioner's determination in the notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he or she is entitled to the claimed deductions. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

Charitable contribution deductions from income are allowed under sections 170 and 642(c). Section 170 provides for income tax deductions for charitable contributions by individual taxpayers and corporations; however, section 170 does not apply to charitable contributions made by estates or certain trusts. Sec. 1.170A–1(j)(1), Income Tax Regs. Under section 642(c)(2) an estate is allowed a current charitable contribution income tax deduction, notwithstanding that the amount will not be paid or used for a charitable purpose until sometime in the future.[8] In the case of an estate, section 642(c)(2) provides, in pertinent part:

> In the case of an estate * * * there shall also be allowed as a deduction in computing its taxable income any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, permanently set aside for a purpose specified in section 170(c), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or for the establishment, acquisition, maintenance, or operation of a public cemetery not operated for profit. * * *

An amount will not be deemed "permanently set aside" for a charitable purpose under section 642(c)(2) "unless under the terms of the governing instrument and the circumstances of the particular case the possibility that the amount set aside, or to be used, will not be devoted to such purpose or use is so remote as to be negligible." Sec. 1.642(c)–2(d), Income Tax Regs.

---

[8] The deduction under sec. 642(c)(2) is to be distinguished from the deduction afforded to an estate under sec. 642(c)(1), which allows a deduction for amounts actually paid during the taxable year to a charity by an estate.

Thus, for an estate to properly claim a charitable contribution deduction pursuant to section 642(c)(2), three criteria must be met: (1) the charitable contribution must be an amount from the estate's gross income; (2) the charitable contribution must be made pursuant to the terms of a governing instrument; and (3) the charitable contribution must be permanently set aside for purposes specified in section 642(c)(2). Respondent does not dispute that the $219,580 distribution was to be from the estate's gross income (i.e., income in respect of a decedent) or that the money was designated for the foundation pursuant to the terms of a governing instrument (i.e., decedent's will). The parties agree that in order for an amount to be "permanently set aside" for a charitable purpose, the estate must be able to establish that "under the terms of the governing instrument and the circumstances of the particular case the possibility that the amount set aside, or to be used, will not be devoted to such purpose or use is so remote as to be negligible." Sec. 1.642(c)–2(d), Income Tax Regs. The parties are in disagreement over whether this standard was met.

The estate argues that there was no "reasonably foreseeable possibility" that it would incur "unanticipated costs associated with litigating * * * [David]'s claims on the California condominium". Respondent argues that "there was a substantial possibility of a prolonged and expensive legal fight which would have required the estate to dip into the funds it allegedly 'set aside' for charity in order to not only pay for the litigation, but to also pay additional administrative costs for the estate as the probate proceedings dragged on for years and years." Respondent concludes that "the [e]state was clearly on notice that a prolonged legal fight was more than just a remote possibility at the time they claimed the charitable deduction and it should have known that there was more than a 'negligible chance' that it would have to apply some of the funds received from the STR[PF] * * * in order to cover the administrative costs of the estate as the probate proceedings continued."

The parties cite no previous Tax Court opinions that directly address the issue. Although this Court has not had occasion to consider the "so remote as to be negligible" standard in the context of section 642(c)(2), we have examined identical language in connection with the regulations

prescribed under section 170. *See Graev v. Commissioner*, 140 T.C. 377 (2013). In *885 Inv. Co. v. Commissioner*, 95 T.C. 156, 161 (1990) (quoting *United States v. Dean*, 224 F.2d 26, 29 (1st Cir. 1955)), we defined "so remote as to be negligible" as "'a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction'". In *Briggs v. Commissioner*, 72 T.C. 646, 657 (1979), *aff'd without published opinion*, 665 F.2d 1051 (9th Cir. 1981), we construed the standard as being "a chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance." [9] With these interpretations in mind, we will consider the facts and circumstances of the matter sub judice to determine whether the possibility that the estate would invade the money set aside for the foundation was "so remote as to be negligible". *See Graev v. Commissioner*, 140 T.C. at 394; sec. 1.642(c)–2(d), Income Tax Regs.

Respondent argues that it is appropriate to consider David's legal claims, all of which were instituted before the estate filed its Form 1041 on July 17, 2008. The estate does not dispute that the information it received between April 1 and July 17, 2008, is relevant to the analysis. Instead, the estate argues that the facts known to it before the filing of its Form 1041 on July 17, 2008, did not create more than a negligible possibility that litigation would require the depletion of its charitable set-aside.

The information that was known or reasonably knowable to the estate when it filed its Form 1041 on July 17, 2008, indicates that David's claim to a life tenancy interest in the Santa Monica condo was a serious claim based on alleged events that predated the end of the taxable year ending March 31, 2008.

The responsibility of the estate in claiming a charitable contribution deduction pursuant to section 642(c)(2) was to marshal information pertaining to the taxable period in order to prepare its return. Using such information the estate was

---

[9] The Commissioner has interpreted the "so remote as to be negligible" standard from a quantitative perspective in the estate tax context, requiring at least a 95% probability that a bequest will pass to a qualifying charity before a deduction is permitted. Rev. Rul. 70–452, 1970–2 C.B. 199.

required to make a judgment regarding the possibility that the funds ostensibly set aside for the foundation might be depleted for another purpose (i.e., litigation over the Santa Monica condo).

The facts and circumstances known to the estate when it filed its Form 1041 on July 17, 2008, were sufficient to put the estate on notice that the possibility of an extended and expensive legal fight—and consequently the dissipation of funds set aside for the foundation—was more than "so remote as to be negligible". To begin with, the estate was aware of its financial situation. As of March 31, 2008, after subtracting the funds that had been ostensibly set aside for the foundation, there was "approximately $65,000" remaining in the estate's residue to cover the remaining expenses associated with the estate administration. When the estate filed its Form 1041 on July 17, 2008, there were no income-producing assets remaining in the estate. From the amount remaining in its residue, the estate was responsible for various expenses. First, the estate was responsible for paying homeowners association fees and property taxes associated with the Santa Monica condo. Second, because the estate administration in Ohio could not be closed until the ancillary proceeding in California was concluded, the estate was responsible for attorney's fees to Mr. Flaherty. The attorney's fees paid to Mr. Flaherty for his work on the Ohio estate administration were not insignificant. For example, from April 1, 2008, to March 23, 2009, the estate paid Mr. Flaherty $29,548.15. Finally, the estate was responsible for attorney's fees to Hoffman, Sabban & Watenmaker for the administration of the ancillary estate in California. These fees included an upfront fee of $13,000 and approximately $350 to $450 per hour for any extra legal services related to potential litigation or an appeal.

The estate faced the possibility that David would engage in prolonged and expensive litigation over his interest in the Santa Monica condo. David's actions leading up to the estate filing its Form 1041 on July 17, 2008, provided information indicating that he would put up a litigious fight. First, David did not vacate the Santa Monica condo and did not agree to the request made in Ms. Sater's letter dated February 14, 2008, to vacate the Santa Monica condo in exchange for a "$10,000 stipend". Second, on April 2, 2008, David filed a

creditor's claim with the Los Angeles County Probate Court asserting information supporting his claim to a life tenancy interest in the Santa Monica condo. Third, on April 24, 2008, David filed a lis pendens action with the California Recorder's Office and the Los Angeles County Probate Court. Fourth, David filed an 850 petition with the Los Angeles County Probate Court on May 30, 2008, asserting the basis for his claims. The estate was aware of these claims and filed its objections. Finally, David retained a prominent California attorney, pro bono, to represent his interests in the Santa Monica condo. All of these events occurred and were known to the estate before July 17, 2008, when the estate claimed a $219,580 charitable contribution deduction on its Form 1041. These facts and circumstances provided an indication to the estate that the possibility of David litigating his alleged interest in the Santa Monica condo was more than negligible. Nevertheless, the estate failed to inform Ms. Becker—the C.P.A. who prepared the return in question—of David's claims against the Santa Monica condo.[10]

The estate contends that David's claims against the Santa Monica condo had no reasonably foreseeable impact on the amount set aside for the foundation at the time that the estate took the deduction. The estate relies on *Commissioner v. Upjohn's Estate*, 124 F.2d 73 (6th Cir. 1941), to support the proposition that "remote possibilities that may deplete funds should not be considered when determining whether funds are permanently set aside for purposes of I.R.C. § 642."[11] In *Commissioner v. Upjohn's Estate*, 124 F.2d at 76, the Court of Appeals for the Sixth Circuit stated:

> *the bare possibility, considered abstractly* and merely in terms of power, of an invasion of a fund devoted to charitable purposes, that is so remote that it may not, as a practical matter, be said to exist at all, does not

---

[10] Mr. Flaherty testified that the estate's decision to take the sec. 642(c)(2) deduction was "[Ms. Becker's] suggestion when she was preparing the return." According to Mr. Flaherty, Ms. Becker was selected to prepare the estate's Form 1041 because she is "knowledgeable in * * * 1041 issues".

[11] The statute at issue in *Upjohn's Estate* was not sec. 642, but rather the Revenue Act of 1936, ch. 690, sec. 162(a), 49 Stat. at 1706. *Commissioner v. Upjohn's Estate*, 124 F.2d 73, 74 (6th Cir. 1941). Sec. 162(a) was the predecessor statute to sec. 642.

render incapable of definite ascertainment the fund devoted to the beneficent purposes recited in the act. [Emphasis added.]

We are not persuaded by the estate's attempt to analogize its situation to that of the estate in *Upjohn's Estate*. In *Upjohn's Estate* there were no facts or claims giving rise to potential litigation that threatened to deplete the estate's assets. To the contrary, the matter sub judice involves existing claims over the Santa Monica condo which were based on facts and circumstances alleged to have occurred before the end of the estate's taxable year. This information was known to the estate at the time it took the charitable contribution deduction, and the possibility that litigation would continue at a steep expense was not "so remote as to be negligible". As discussed above, during the taxable year the estate made several attempts to remove David from the Santa Monica condo; however, David rejected all financial offers to relinquish the property. David then initiated various legal actions to have his interest in the Santa Monica condo adjudged.

The estate also seeks support for its position from the Court of Appeals for the Ninth Circuit's opinion in *Estate of Wright v. United States*, 677 F.2d 53 (9th Cir. 1982). In *Estate of Wright*, the decedent's will directed that the residue of the estate go entirely to charitable purposes. *Id.* at 53. Despite a pending will contest initiated by the decedent's sister, the taxpayer-estate took a charitable contribution deduction for 100% of the income arising from the estate. *Id.* at 53–54. After the will contest concluded, only 50% of the residual estate was distributed for charitable purposes and the remaining 50% went to the will challengers. *Id.* at 54. The issue before the Court of Appeals was whether 100% of the income arising from the estate during the period when the will contest was pending was deductible pursuant to section 642(c). *Id.* The Court of Appeals ruled for the Commissioner, holding: "[W]e cannot say that funds are 'permanently set aside' if the will is the subject of a compromised will contest." *Id.*

The estate attempts to distinguish its case from *Estate of Wright* and argues that, because there is no will contest in the matter sub judice, the possibility that the charitable contribution would be invaded was so remote as to be negligible.

Although we agree with the estate that there is no will contest in the matter sub judice, we find the Court of Appeals' reasoning in *Estate of Wright* supportive of our decision. The rationale underlying the Court of Appeals' holding in *Estate of Wright* is that pending litigation (e.g., a will contest) creates a possibility that a charitable gift may not be effected and consequently, an estate cannot permanently set aside funds as required by section 642(c)(2). Although David was not contesting decedent's will, his active litigation of his property rights to the Santa Monica condo created a real possibility that the funds set aside for the foundation would be depleted during the pendency of the lawsuit. Given the estate's known financial situation and the claims brought by David concerning the Santa Monica condo, a real possibility existed that the funds set aside for the foundation would be invaded in order to continue the estate administration. For these reasons it was not "so remote as to be negligible" that the funds set aside for the foundation would be depleted because of the ongoing and future litigation over the Santa Monica condo. Accordingly, we hold that the $219,580 was not "permanently set aside" as required by section 642(c)(2) and section 1.642(c)–2(d), Income Tax Regs.

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*