T.C. Memo. 2015-184

UNITED STATES TAX COURT

ESTATE OF JOHN D. DIMARCO, DECEASED, LAURENCE AGNES, EXECUTOR, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1132-14.                          Filed September 21, 2015.

Michael T. Brockbank, for petitioner.

Jane J. Kim, for respondent.

MEMORANDUM OPINION

LARO, <u>Judge</u>:  This case is before the Court for review of a notice of deficiency issued to the Estate of John D. DiMarco (estate) determining a $108,588 deficiency in the estate's Federal income tax for the taxable year ending

**[*2]** December 31, 2010. The parties submitted this case to the Court fully stipulated, without trial, under Rule 122.[1]

The sole issue before the Court is whether the estate is entitled to a $314,942 charitable contribution deduction claimed on the estate's 2010 Form 1041, U.S. Income Tax Return for Estates and Trusts, under section 642(c)(2). This section allows an estate to claim a charitable contribution deduction for an amount permanently set aside for charitable purposes. The parties disagree whether the amount was permanently set aside for charitable purposes. We hold that it was not and that the estate is not entitled to the charitable contribution deduction.

## Background

We derive our background statement of this case from the pleadings, the parties' stipulations of facts, and the exhibits submitted therewith. The stipulations of facts and the accompanying exhibits are incorporated herein by this reference. John D. DiMarco (decedent) died testate on December 16, 2008, a resident of New York. Decedent was an unmarried individual with no children. Both of decedent's parents predeceased him. Michael Brockbank, counsel of

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code (Code) in effect at the relevant times.

[*3] record for the estate, prepared and untimely submitted the estate's Form 1041 for the 2010 taxable year on or about April 19, 2012, which respondent received on April 22, 2012. For the 2010 taxable year, the estate reported $335,854 of total income and claimed a $314,942 charitable contribution deduction from gross income as an amount permanently set aside for charitable purposes. On October 25, 2013, respondent issued a notice of deficiency to the estate for the 2010 taxable year. The notice of deficiency denied the $314,942 charitable contribution deduction and determined a deficiency in tax of $108,588. The estate's executor, Laurence Agnes, resided in New York, where decedent's will was probated, when the petition was timely filed on January 22, 2014.

On February 25, 1983, decedent executed a will while living in Hartford, Connecticut. Decedent had three witnesses sign the will. Article I, paragraph 1, of the will directs the executor to pay all estate expenses including probate and administration costs, debts, funeral, burial, taxes, and any medicals bills but excluding encumbrances on real property, from the general estate. Such expenses are not to be levied against any particular beneficiary. The same paragraph directs that where any gift, bequest, or device is expressed as a percentage in the will any percentage stated therein refers to that portion of the gross estate available for distribution unless stated otherwise.

**[*4]**  Article III, paragraphs 2 and 3, conveys 100% of the residuary estate to the church decedent regularly attended.  The terms of decedent's will do not specifically provide for gross income to be permanently set aside or separated into distinct accounts.

Article IV, paragraph 1, appoints John DiMarco, decedent's father, as executor of decedent's estate.  Should John DiMarco predecease decedent, the designated executor is the pastor at the church decedent regularly attended.  Immediately before his death, decedent regularly attended the Calvary Tabernacle Assembly of God as well as the New Life Ministries.  Laurence Agnes and Ed Berggren were pastors at the respective churches during that time.  They assumed the duties over decedent's estate together as proposed coexecutors.

In May 2009 Sandra DiMarco Solomon, one of decedent's heirs at law, contacted Frederick W. Killeen, an experienced trusts and estate attorney and escrow agent on behalf of the estate, regarding possible legal representation of her and other relatives concerning decedent's estate.  Mr. Killeen met with a group of heirs in August 2009.  They discussed their potential interests in the estate, the will's effect on those interests, and the possibility of retaining Mr. Killeen in connection with the anticipated estate proceedings.

**[\*5]**  On October 26, 2009, the coexecutors filed a Form P-1, Petition for Probate, to probate decedent's will in the Surrogate's Court of the State of New York Schenectady County (surrogate's court).  The petition identified seven individuals as distributees--Sandra DiMarco Solomon, Gail C. Chmielinski, Judith Dowd, James DiMarco, Kenneth Copozucco, Roberta DiMarco (Bradt), and Alfred DiMarco (collectively, intervenors)--all of whom were related to decedent as paternal cousins.  On February 3, 2010, Mr. Killeen filed a notice of appearance as counsel retained to represent the intervenors with the surrogate's court.

At the request of New York State Assistant Attorney General (NYSAAG) Donald P. Segal, who appeared on behalf of charitable beneficiaries, the surrogate's court adjourned the matter until March 16, 2010.  On that date, in response to applications filed by the coexecutors, the surrogate's court ordered Preliminary Letters Testamentary granting the coexecutors authority under those letters until June 16, 2010, at which date the letters were set to expire.[2] The surrogate's court issued a first supplemental citation directing service of process to the respective parties who might have an interest in decedent's estate returnable May 11, 2010.  The matter was adjourned until May 28, 2010, when the acting

---

[2]The surrogate's court continually renewed these letters until it replaced the temporary letters with full letters testamentary on May 1, 2012, the date probate began.

[*6] surrogate's court judge recused himself. The matter was then further adjourned until June 22, 2010.

On October 25, 2010, the coexecutors filed an amended Form P-1 to reflect potential unknown heirs, who, if living, might also qualify as distributees. On October 26, 2010, the acting surrogate's court judge appointed Dennis W. Habel, to serve as guardian ad litem (GAL) to help find and represent any unascertained descendants. The amended Form P-1 identified the following individuals as potential heirs: Placid Cappuccio, Rose Cappuccio, Andrew Cappuccio, Nicholas J. Cappuccio, and Sam Cappuccio. Placid Cappuccio and Rose Cappuccio were listed as deceased. Andrew Cappuccio was listed as a sibling of decedent's mother, but his domicile was unknown. Nicholas Cappuccio was listed as a possible maternal nephew of decedent's mother, but his domicile was also unknown. Sam Cappuccio was listed as a sibling of the decedent's mother, but it was also unknown whether he was alive, and if so, where he was domiciled.

On December 6, 2010, a second supplemental citation was issued, served by publication, and made returnable. Following the issuance of the second supplemental citation, Mr. Habel, on behalf of the unknown maternal heirs, filed an initial report dated December 10, 2010. The report raised questions regarding the completion of service of the citation and the "vague and ambiguous" nature of

**[*7]** the provisions in decedent's will.[3]  On December 16, 2010, the surrogate's court held a conference with various counsels.  The parties discussed the possibility of scheduling a Surrogate's Court Procedure Act (SCPA) section 1404 proceeding (examination of attesting witnesses).  However, it was undetermined whether any of the three witnesses to decedent's will could be found.  One witness had died, another witness was believed to reside in Illinois, and the remaining witness, who was believed to reside in Connecticut, had not yet been found.  The surrogate's court obtained jurisdiction over all the necessary parties sometime in December 2010.  The surrogate's court determined it could admit the will into probate upon the attestation of a single witness.  The court adjourned the matter until February 23, 2011.

Following Mr. Habel's initial report, Mr. Killeen prepared demands for discovery and inspection with respect to a possible SCPA section 1404 proceeding.  These were served upon the proponent's attorney, Mr. Brockbank, on January 31, 2011.  Similar demands were also served by Mr. Habel for the

---

[3]The estate's response to a motion to dismiss for lack of jurisdiction filed by respondent (which the Court denied) included a sworn affidavit from Mr. Agnes, in which he stated that the intervenors informed him that they were considering objecting to the probate of the will.  He acknowledged that the will had unusual language, that the drafter had died, there were unknown heirs, and that the witnesses to the will lived outside the State of New York.

[*8] unknown heirs. The SCPA section 1404 proceeding was tentatively scheduled for February 23, 2011. In addition, during the period following the GAL report Mr. Killeen researched other issues that would affect the intervenors' ability to protest the probate of decedent's will. He informed his clients that these other options were unlikely to succeed given the applicable Connecticut probate code relating to charitable bequests and the lack of other patent defects in the will. Mr. Killeen elected to explore the possibility of negotiating a settlement to benefit his clients. On April 29, 2011, in a letter to his clients Mr. Killeen outlined the reasons supporting his settlement strategy.

The surrogate's court postponed the SCPA section 1404 proceeding until June 1, 2011, because the only available witness could not travel. Instead, the surrogate's court held a conference. During this conference, settlement discussions began, which NYSAAG Segal opposed at that time. However, the June 1, 2011, proceeding did not occur because Mr. Killeen and Mr. Habel's disclosure demands were incomplete and the witness was still unable to travel.

In late summer 2011 NYSAAG Segal retired and Patrick T. Morphy replaced him. Also during this same time, Mr. Habel requested permission from the surrogate's court to employ a genealogical investigator to determine whether any additional maternal heirs existed. On January 30, 2012, the genealogical

[*9] investigator completed his report and determined no such heirs existed.  As a result, the surrogate's court determined it no longer needed a GAL and discharged Mr. Habel from his GAL duties that same day.  After receiving this information, the surrogate's court recommended that the parties continue settlement discussions.

Following a March 22, 2012, settlement conference with the surrogate's court, the matter was adjourned until April 26, 2012.  In conjunction with that settlement conference, the estate prepared a proposed distribution schedule that accounted for the estate's expenses up to March 14, 2012, distributions to the respective beneficiaries, and estimated amounts for the coexecutors' commissions, housing expenses, and real estate commission.  At some point in April 2012 the parties settled regarding the basis of the probate proceeding in the surrogate's court.  At Mr. Killeen's recommendation, his clients agreed to the proposed settlement terms.  The settlement provided that the intervenors would receive approximately one-third of decedent's gross probate estate and that they would equally split that one-third interest.  The Calvary Tabernacle Assembly of God and New Life Ministries would equally split the remaining two-thirds of decedent's gross probate estate.  Each one-third share was worth approximately $173,250.  The distributable estate's value was $519,763.  On April 26, 2012, the parties

**[*10]** stipulated on the record in the surrogate's court that a settlement had been reached (first settlement). The surrogate's court judge admitted decedent's will into probate on May 1, 2012. Mr. Killeen did not file any formal objections to the probate of decedent's will, nor was an SCPA section 1404 proceeding taken.

Shortly after the coexecutors sold the last remaining asset, decedent's home, they sent the surrogate's court an update letter dated December 28, 2012. The letter stated that the parties had reached a further settlement agreement (second settlement) regarding the payment of all the attorney's fees and the coexecutors' commissions. The distributees agreed to pay all attorney's fees directly from their settlement shares. The coexecutors agreed to share an amount equal to 1-1/2 times a statutory commission. On or about January 28, 2013, the surrogate's court received the letter and approved the second settlement.

All distributees of decedent's estate submitted receipts and releases to the surrogate's court. These reflected the amount paid to each distributee and the payment date.

[*11] The amounts received by the family members are as follows:

| Recipient | Payment amount | Date received |
|---|---|---|
| Gail DiMarco Jess | $20,000.00 | May 15, 2012 |
| | 1,598.20 | Feb. 11, 2013 |
| Sandra M. DiMarco Solomon | 20,000.00 | May 15, 2012 |
| | 1,598.20 | Feb. 8, 2013 |
| Alfred DiMarco | 20,000.00 | May 16, 2012 |
| Kenneth Capozucco | 1,598.20 | Feb. 12, 2013 |
| Carol A. Capozucco (surviving spouse of Kenneth Capozucco) | 20,000.00 | May 16, 2012 |
| | 1,598.20 | Feb. 21, 2013 |
| Roberta DiMarco Bradt | 20,000.00 | May 17, 2012 |
| | 1,598.20 | Feb. 14, 2013 |
| Judith DiMarco Doud | 20,000.00 | May 17, 2012 |
| | 1,598.20 | Feb. 10, 2013 |
| James DiMarco | 20,000.00 | May 17, 2012 |
| | 1,598.20 | Feb. 10, 2013 |

The exempt residuary beneficiaries received a total of $343,890 from the estate. The amounts received by the pastors of the two churches in their capacities

[*12] as pastors receiving charitable bequests for their respective churches, and the coexecutors' commissions, are as follows:

| Recipient | Recipient status | Amount | Date of receipt |
|---|---|---|---|
| Mark J. Esslie | Trustee of Calvary Tabernacle Assembly of God | $140,000 | May 3, 2012 |
| Laurence Agnes | Pastor of Calvary Tabernacle Assembly of God Coexecutor of the estate | 31,945 17,464 | Feb. 5, 2015 Feb. 5, 2013 |
| Timothy J. Whitcomb | Treasurer of New Life Ministries | 140,000 | May 12, 2012 |
| Edward Berggren | Pastor of New Life Ministries Coexecutor of estate | 31,945 17,464 | Feb. 5, 2013 Feb. 5, 2013 |

## Discussion

### I. Overview

The sole issue for decision is whether the estate is entitled to a charitable contribution deduction under section 642(c)(2) for an amount allegedly permanently set aside for charitable purposes. The estate argues that it

[*13] permanently set aside $314,942 for the benefit of the two churches decedent had been attending around the time of his death. Respondent argues that this amount was not permanently set aside under section 642(c)(2) and does not meet the so remote as to be negligible standard pursuant to section 1.642(c)-2(a)(1), Income Tax Regs., and therefore is not deductible by the estate.

II.    Burden of Proof

In general, the Commissioner's determination in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Pursuant to section 7491(a), the burden of proof as to factual matters shifts to the Commissioner under certain circumstances. The estate has neither alleged that section 7491(a) applies nor established compliance with its requirements. Accordingly, the estate bears the burden of proof.

III.    Charitable Contribution Deductions Pursuant to Section 642(c)(2)

Deductions are a matter of legislative grace, and a taxpayer bears the burden of producing sufficient evidence to substantiate items underlying any allowable deduction. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Under section 642(c)(2) an estate may claim a current charitable contribution deduction, notwithstanding that the amount will not be paid or used

**[*14]** for a charitable purpose until sometime in the future.  Section 642(c)(2)

provides, in pertinent part:

> In the case of an estate * * *
>
>      *      *      *      *      *      *      *
> there shall also be allowed as a deduction in computing its taxable
> income any amount of the gross income, without limitation, which
> pursuant to the terms of the governing instrument is, during the
> taxable year, permanently set aside for a [charitable] purpose
> specified in section 170(c) * * * [Emphasis added.]

 An amount is permanently set aside when "the income is appropriated and

dedicated finally and for all time by the will or other instrument... so that there

may be no changes which may destroy the character of such action."  Genesee

Merchants Bank & Trust Co. v. United States, 37 A.F.T.R.2d (RIA) 76-747 (E.D.

Mich. 1976) (alteration in original) (fn. refs. omitted) (quoting 6 Mertens, Law of

Federal Income Taxation, sec. 36-109 (1976 rev.)).  An unconditional gift of the

residue's principal may qualify as a permanent setting aside of the income as well

as principal.  Bowers v. Slocum, 20 F.2d 350 (2d Cir. 1927); see Middleton v.

United States, 99 F. Supp. 801, 803 (E.D. Pa. 1951).

For the estate to claim the charitable contribution deduction pursuant to

section 642(c)(2), it must meet three requirements:  (1) the charitable contribution

[*15] must be an amount from the estate's gross income;[4] (2) the governing instrument's terms made the charitable contribution; and (3) the charitable contribution was permanently set aside for a charitable purpose as defined under section 170(c). See Estate of Belmont v. Commissioner, 144 T.C. 84, 90-91(2015).

Respondent does not argue that the estate failed to meet the first two requirements of section 642(c)(2) and did not discuss those issues on brief. Accordingly, we find the estate satisfies the first two requirements under section 642(c)(2).

We now discuss whether the residue designated by the will as a charitable gift qualifies as a charitable contribution permanently set aside for charitable purposes as defined under section 642(c)(2) and further defined by section 1.642(c)-2(d), Income Tax Regs. The regulations require the estate to prove that the possibility that the amount set aside for the charitable beneficiaries would go to noncharitable beneficiaries was so remote as to be negligible. Sec. 1.642(c)-2(d), Income Tax Regs. The resolution of this issue will depend on whether the undeterminable legal expenses, administrative expenses, and beneficial interests of

---

[4]Income that is includible in an estate pursuant to sec. 691(a)(1) as income in respect of a decedent shall be included in the estate's gross income. Sec. 1.642(c)-3(a), Income Tax Regs.

**[*16]** the estate met the so remote as to be negligible standard. We find that during the year at issue the estate was in the midst of an ongoing legal controversy that was not fully resolved at the time the estate filed its tax return. The ongoing undetermined expenses and the chance that amount might go to the intervenors made the possibility not so remote as to be negligible that the amount set aside for the two churches would go to noncharitable beneficiaries.

## IV.   So Remote as To Be Negligible

This Court has examined the so remote as to be negligible standard pursuant to the regulations under sections 642 and 170. See Estate of Belmont v. Commissioner, 144 T.C. at 88; Graev v. Commissioner, 140 T.C. 377 (2013). As discussed recently in Estate of Belmont v. Commissioner, 144 T.C. at 92, and 885 Inv. Co. v. Commissioner, 95 T.C. 156, 161 (1990) (quoting United States v. Dean, 224 F.2d 26, 29 (1st Cir. 1955)), "we defined 'so remote as to be negligible' to mean 'a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction'". "It is likewise a chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance." Briggs v. Commissioner, 72

**[*17]** T.C. 646, 657 (1979), aff'd without published opinion, 665 F.2d 1051 (9th Cir. 1981).

In Estate of Belmont v. Commissioner, 144 T.C. at 85, the decedent's will gave a specific gift of $50,000 to her brother, and the residue, consisting of various properties, to a charitable organization. The estate kept its funds in one unsegregated bank account used to pay all estate expenses. Id. The decedent's brother lived in one of the estate's properties and refused to move out after demands from the estate and the charitable organization. Id. The estate denied his April 2, 2008, creditor claim for a life estate in the property. Id. at 88-89. The probate court held a trial to decide the merits of his subsequent lawsuit that claimed a life estate in the property. Id. On January 26, 2012, almost five years after his sister died, the probate court awarded him a life estate in the property. Id. at 89. On February 28, 2013, the California Court of Appeal upheld the probate court's decision. Id. 89-90. Despite the current litigation at the time, the estate claimed the entire residue as a permanently set-aside charitable contribution deduction on its Form 1041 for the taxable period ending March 31, 2008, which it filed on July 17, 2008. Id. at 86. The Commissioner issued a notice of deficiency denying the estate's entire charitable contribution deduction,

[*18] determining the amount did not meet the permanently set aside for charitable purposes standard. Id. at 84.

This Court upheld the notice of deficiency, finding that the amount supposedly permanently set aside for charitable purposes did not satisfy the so remote as to be negligible standard. Id. at 96. The Court determined that the brother had "a serious [legal] claim based on alleged events that predated" the taxable yearend. Id. at 92. These facts indicated that he would likely actively litigate his contentions and demonstrated that the possibility that a prolonged legal controversy might deplete the permanently set-aside funds was not so remote as to be negligible. Id. at 93.

We now consider the circumstances of our case. The estate argues that as of March 22, 2012, it could determine and account for all of its final administrative expenses. The estate points to the settlement meeting that occurred on the same date as evidence that the possibility of prolonged legal controversies over estate matters was so remote as to be negligible. The estate claims that if admitted into probate the will did not provide an option, power, or discretion that would operate to preclude the churches from receiving the charitable gifts. Finally, the estate argues that respondent incorrectly applied the caselaw pertaining to whether an amount can be permanently set aside during a will contest.

**[\*19]** Respondent argues that multiple factors cut against the inference that the funds were permanently set aside because in view of the uncertainties and legal controversy the possibility that the estate's assets might go to noncharitable beneficiaries was not so remote as to be negligible. Respondent further argues that the estate cannot permanently set aside funds as a matter of caselaw when there is a pending will contest or active litigation, the result of which might distribute the estate's funds to noncharitable beneficiaries.

Respondent argues that the following factors prove that the estate does not meet the so remote as to be negligible standard. The factors are: (1) as of the due date of the estate's tax return, the estate knew that Mr. Killeen was representing the intervenors contesting the will (intervenor action), and therefore the estate could anticipate additional litigation costs; (2) the will contest in the surrogate's court involved Mr. Killeen, the NYSAAG, and the GAL, all representing potentially conflicting interests and necessitating litigation costs; (3) the intervenor action involved multiple attempts to find witnesses to the will, including demands for discovery with respect to a possible SCPA section 1404 proceeding; (4) accruing additional administrative expenses in defending a challenge to the will could be "vague, uncertain, ambiguous and indefinite and therefore void"; (5) a genealogical study to find potential unknown heirs was

[*20] conducted; and (6) the funds were not actually permanently set aside. We agree with respondent that factors 1 through 4 are evidence that during the year in issue and through the time when the estate filed its tax return there was a legal controversy, thus making it likely if not certain that additional legal expenses and coexecutors' commissions would deplete estate assets. Factor 5 favors the estate because the genealogical study that showed no unknown heirs existed concluded before the estate filed its tax return.

Factor 6 pertains to the failure of the estate to segregate the funds into a separate account. The estate held funds in a general account which it used to pay all the estate expenses. Neither the estate nor the coexecutors made an effort to isolate or specifically designate the funds as permanently set aside for charitable purposes. Factor 6 favors respondent's argument to a small degree, taking into consideration the overall circumstances.

Respondent points to the multiple persons involved to show that the estate was confronted with a legal controversy to determine the rights of the respective parties. The estate contends that the presence of those persons was strictly to establish the surrogate's court's jurisdiction. We examine each person in turn to determine whether the presence of those persons was an indication of a prolonged legal controversy.

**[\*21]** On October 26, 2009, the coexecutors filed Form P-1, which listed seven potential heirs. On October 25, 2010, the coexecutors filed the amended Form P-1, which listed five newly discovered individuals who might have an interest in the estate. The surrogate's court appointed Mr. Habel as the GAL to find and represent these newly discovered individuals, as well as to find and represent additional unknown heirs. After unsuccessful attempts to find heirs through publication, the surrogate's court approved a genealogical study which concluded that no additional unknown heirs existed.

On January 30, 2012, the surrogate's court discharged Mr. Habel. The estate accounted for his respective fees and the fees for the genealogical study before filing its income tax return on April 19, 2012.

Form P-1 listed the intervenors as "distributees" despite the will's not providing for any clear disposition with respect to them. This should have alerted the estate that the intervenors might assert a claim against the estate or challenge the will. The intervenors retained Attorney Killeen to do both. On February 3, 2010, Mr. Killeen entered an appearance on behalf of his clients with the surrogate's court. Even though Mr. Killeen recommended that his clients settle, once he conveyed his intent to challenge the will and/or assert a claim on behalf of

**[*22]** his clients, the estate knew that a legal controversy was a possibility and, with such a controversy, resultant costs to the estate.

SCPA section 1409(1) requires the surrogate's court to send notice to the NYSAAG when a will makes a charitable bequest which is either to an unnamed charitable organization or of an unspecified amount to a named charitable organization. Decedent's will made both types of bequests. The NYSAAG had a statutory obligation to protect the charitable beneficiaries' rights. See N.Y. Est. Powers, & Trusts Law sec. 8-1.1(f) (McKinney 2002 & Supp. 2015).

The NYSAAG sought to validate the will and enter it into probate. To do so, the surrogate's court needed one witness to attend an SCPA section 1404 proceeding. However, finding one proved difficult because one witness was dead, another was believed to reside in Illinois, and the third was believed to reside in Connecticut but had not yet been found. Both attempts to conduct the SCPA section 1404 proceeding failed. The only witness found was unable to travel to New York on either occasion. The surrogate's court could not validate the will without this examination, a prerequisite for admission into probate.

The estate overlooks the fact that the NYSAAG and Mr. Killeen represented conflicting beneficial interests. Thus, the NYSAAG's presence at this point was not strictly jurisdictional and suggested a possible prolonged legal controversy. In

[*23] that event, the estate would continue to incur legal expenses thereby diminishing the amount that the charitable beneficiaries might receive. These legal controversies were not resolved until the surrogate's court approved the second settlement on January 28, 2013, and the proceedings did not end until the estate made its last distribution on February 21, 2013, both of which occurred after the year at issue and the estate's filing of its income tax return.

With the exception of Mr. Habel, the involvement of the aforementioned persons should have alerted the estate that a potential legal controversy was likely.

We now turn to the estate's argument that the settlement meeting on March 22, 2012, is evidence that a prolonged legal controversy was unlikely and by that time the estate had determined and accounted for all of the administrative expenses. The estate points out that the settlement negotiations took less than three months, from January 2 to March 12, 2012, after the surrogate's court obtained jurisdiction and determined that the current litigants were all the necessary parties. The estate contends that this period was insufficient to constitute a legal controversy.

The estate untimely filed its income tax return on April 19, 2012, before the surrogate's court approved the first settlement on April 26, 2012. Decedent's will could always be challenged until the surrogate's court validated the will or

[*24] approved a settlement that overrode the will and finalized probate. On February 23 and June 1, 2011, the surrogate's court had attempted to validate the will, without resolution. The parties also made discovery and demand requests in the course of these proceedings. Thus, the estate continued to incur legal fees and coexecutors' commissions regarding the legal controversy. On April 26, 2012, the parties went on record with the surrogate's court to finalize the first settlement. When the surrogate's court approved the first settlement, it overrode the will and the first settlement became the new governing instrument that controlled the disposition of the estate's assets.

The parties' first settlement allocated the beneficial interests in the estate. This first settlement, however, still did not make the possibility so remote as to be negligible that the two churches' respective shares would go to noncharitable beneficiaries because the issue of legal fees and coexecutors' commissions remained unsettled. This issue remained unresolved until over eight months later when on or about January 28, 2013, the surrogate's court accepted the parties' second settlement with respect to the attorney's fees and coexecutors' commissions. Nevertheless, the estate claims that it accounted for the coexecutors' commissions and attorney's fees in a proposed distribution schedule. The proposed distribution schedule's title indicates however, that the schedule was

[*25] merely proposed and therefore not final. In any event, the distribution schedule in fact omitted possible future fees for the estate's own attorney Mr. Brockbank and the NYSAAG. Those omissions suggest that the fee schedule did not account for the final administrative expenses.

At the time the estate filed its income tax return, it was not known how long it would take to validate the will, reach a settlement, or conduct probate. Only after the surrogate's court approved the second settlement on or about January 28, 2013, were the estate's funds finally dedicated to the respective parties, thereby eliminating any opportunity to challenge the will. Genesee Merchants Bank & Trust Co., 37 A.F.T.R.2d (RIA) 76-747. By virtue of the fact that the settlements pertaining to designation of the beneficiaries and consequential legal and administrative expenses were not finalized until after the year at issue and the estate filed its income tax return, we find that the possibility that the funds would go exclusively to noncharitable beneficiaries was not so remote as to be negligible.

V.   Legal Controversy

The estate contends that the intervenors did not contest the will or object to the  probate of the will and that the settlement conferences were not contentious. Respondent argues that the intervenor action was a will contest which disqualifies the funds from meeting the permanently set-aside standard. Respondent contends

[*26] that an amount could not be permanently set aside for charitable purposes as long as the intervenor action continued. Respondent relies upon Estate of Belmont v. Commissioner, 144 T.C. at 88 (finding that active litigation, even if not a will contest, disqualifies funds from meeting the permanently set aside standard under section 642(c)(2)), to support his position that the funds were not permanently set aside. See also Estate of Wright v. United States, 677 F.2d 53 (9th Cir. 1982), (holding that income from an estate cannot be permanently set aside during the pendency of a will contest).

The estate asserts that settlement conferences are not sufficient to invoke the holding set forth in Estate of Belmont where an amount cannot be permanently set aside during active litigation. We disagree. The surrogate's court held multiple meetings and settlement conferences and scheduled two SCPA section 1404 proceedings, and the parties filed discovery requests and demands. These activities spanned three years. It is fair to presume that the settlement conferences were held to resolve contentious legal issues. Absent the Surrogate's Court's approval, probate could not begin and the estate could not make any distributions. We find the negotiations here were tantamount to a legal controversy to the effect that the funds did not meet the permanently set aside standard under Estate of Belmont.

**[*27]**                                        <u>Conclusion</u>

Any arguments not discussed in this opinion are irrelevant, moot, or lacking

in merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.